THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRICK W. HEATON, Defendant-Appellant.

Second District    No. 2—92—0634

Opinion filed February 4, 1994.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers, Robert J. Biderman, Leslie A. Hairston, and Norbert J. Goetten, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COLWELL delivered the opinion of the court:

Following a jury trial in the circuit court of Du Page County, defendant, Patrick Heaton, was found guilty of second-degree murder. (Ill. Rev. Stat. 1991, ch. 38, par. 9—2(a)(2) (now 720 ILCS 5/9—2(a)(2) (West 1992)).) The trial court imposed a sentence of 13 years of imprisonment. Defendant appeals, alleging that the trial court committed reversible error in instructing the jury as to the additional limits on the use of force available to the defendant without any evidentiary basis for the proposition that the defendant was the initial aggressor in the confrontation that led to the death of Roy Rauch. We affirm.

The events leading up to the incident concern two groups of friends. Defendant's group included Bill Bradley, Illya "Monte" Grigsby, Jay Weldon, and Bill Quigley, some or all of whom were associated with the "Latin Kings" street gang. The group of the decedent, Roy Rauch, included his brothers, Jay and Chris Rauch, Phil Herriman, and Steve Gramm. There is some suggestion that one of these individuals may have been affiliated with the "Gangster Disciples" street gang. The testimony at trial revealed, with some discrepancies, that the following incidents precipitated the events and eventual demise of Roy Rauch.

Jay Rauch was visiting his girlfriend, Kelly Leiser, at her home

on July 3, 1991. Bill and Wayne Bradley came to Leiser's home requesting money allegedly owed to them by Leiser. Jay and Bill then got into a fight which resulted in Wayne hitting Jay in the head with a hockey stick and Jay returning blows to both Wayne and Bill with the hockey stick.

At around 10 p.m. on July 14, 1991, some friends dropped Jay Rauch off at the Glen Theatre in Glen Ellyn to meet Leiser. When Jay saw Bill Bradley and Monte Grigsby nearby, he thought "there might be trouble" and grabbed a wrench from the car and proceeded toward the theater. Jay was then chased by Grigsby, Bradley, Jay Weldon, Bill Quigley, and defendant. Defendant followed Jay Rauch into the theater, calling him a "pussy" and taunting him to fight. After theater personnel told Rauch and defendant to leave, defendant left and Rauch remained inside and called his brother, Roy. Shortly thereafter, Roy arrived at the theater with Chris Rauch, Phil Herriman, and Steve Gramm. They proceeded to drive around looking for defendant and his friends but were unable to locate them.

The Rauch group drove to a house where they thought they might find defendant's group. After this unsuccessful venture, they drove on and questioned two boys they found in front of Glenbard West High School. The boys did not know defendant's whereabouts. The Rauch group decided to proceed to Jay Weldon's house but stopped first at a White Hen Pantry along the way. Jay Rauch went behind the building to urinate. He grabbed a stick he found there in anticipation of a fight at Jay Weldon's house. The evidence indicates that someone in Rauch's group also purchased beer at the White Hen. They proceeded to Weldon's house in Glendale Heights at around 11 p.m. in Leiser's car and Chris Rauch's Ford Escort.

Jay Rauch said that when they arrived at Jay Weldon's house he saw several "Kings" standing in front of the house, including Weldon, Grigsby, and Bill Bradley. The Rauch group parked their cars a couple of houses down the street and proceeded toward the house. Jay carried the stick and others in the group carried beer bottles. Grigsby, who was standing closest to the Rauch group, heard Rauch's group shout "KK. We're going to kill you, nigger." Grigsby testified that "KK" stood for "King Killer," which indicated the group wanted to beat him up or kill him. Grigsby stepped into the street and told them to "come on, bring it on." The Rauch group ran at Grigsby while throwing bottles at him, and Grigsby threw a bottle that connected with one of them.

The testimony at this point varies. Jay Rauch testified that his group started to chase Grigsby up the front lawn of the Weldon house. Jay Rauch gave the stick to his brother Chris. Chris then dropped

the stick and began running back to their cars. Jay Rauch testified that he followed Chris to their cars and then jumped on the hood of the Escort. Bill Bradley began hitting Jay in the legs with a baseball bat and someone else was smashing the windows of the car. Chris and Jay Rauch were somehow able to drive the car down the street with Jay still on the hood. Jay then said they had to go back because Roy was left behind at the scene. When Jay and Chris neared the Weldon house, an ambulance had already arrived and was taking Roy to the hospital. Jay did not see what happened to Roy.

According to Monte Grigsby, some of the Rauch group chased after him and some chased after Bill Bradley. Grigsby then heard Jay Weldon's father come outside and ask what was going on. Grigsby testified that when Jay Weldon's father came out, the Rauch group ran down the street towards their cars. Jay Weldon, Bill Bradley, and defendant chased after them. Grigsby then saw someone wrestling with Bill Bradley. When Grigsby got closer, he saw it was Roy Rauch wrestling with Bradley. Roy threw Bill off and was getting up when Grigsby kicked him in the head. Roy went back down to the ground. Roy grabbed for something and he and Bill continued wrestling until Roy threw Bill off again. Grigsby could not tell what Roy was grabbing for but he saw a big stick about two feet away. At that point, defendant took a "golf swing" and hit Roy in the ribs with an object Grigsby could not identify. Roy went down on his stomach and did not get up. Defendant hit him again in the ribs and Roy rolled on his back. Grigsby heard Jay Weldon's father shout that he had called the police. Defendant then took an overhead swing and hit Roy again on the front area on the chest and face but Grigsby did not see him hit Roy in the head. Grigsby still could not tell what defendant was using to hit Roy Rauch. About two minutes later when Grigsby and defendant were near the Weldon house, defendant said "I think I killed the Old Boy."

Grigsby also said that Roy's head hit the curb while he was wrestling with Bill Bradley. The State then questioned Grigsby about the discrepancy between his testimony at trial and his previous grand jury testimony. The State read previous testimony to the jury in which Grigsby had specifically testified that defendant hit Roy Rauch in the head with an aluminum baseball bat.

Matt Weldon, Jay Weldon's brother, testified that he was at the Weldon home on the night of the occurrence. Matt had a conversation with defendant after the fight during which defendant said he had chased down and hit the "Old Boy" on the head, the throat, the chest, and then on the head again. Matt asked defendant where the baseball bat was and defendant replied that "it was taken care of."

Anthony Mineo, a detective with the Glendale Heights police department, was notified by the police dispatcher that defendant had surrendered himself and wanted to talk to him. Defendant and Mineo had met several times in the past. Mineo testified that defendant approached Mineo at the Du Page County jail on July 20, 1991, and defendant said he wanted people to know the truth. Defendant told Mineo that "all he wanted to do was show them what he was about and that he killed the Old Boy."

Defendant then told Mineo his version of the events of the evening of July 14, 1991. After the incident at the Glen Theatre, defendant and his friends went over to Jay Weldon's house. They were standing outside when a group of people charged at them throwing beer bottles. Defendant told Mineo he got an aluminum bat out of Jay Weldon's van and jumped on top of Jay's father's van, screaming "if you want some, come get some." Defendant then noticed the people had gone and run back towards their cars. At this point, defendant, Monte Grigsby, Jay Weldon, and Bill Bradley began to chase after them. Defendant saw Jay Weldon pick up a stick and hit Jay Rauch with it. The cars were then trying to pull away when defendant saw Bill Bradley on the driver's side of the Escort fighting with Jay Rauch. Defendant said he smashed out the rear window and the rear passenger side window of the Escort with a baseball bat. Defendant said that Roy Rauch, who had been sitting in the front passenger's seat of the vehicle, exited the vehicle and grabbed Monte Grigsby with his left hand. Rauch appeared to have something in his right hand. Before Roy Rauch could hit Grigsby, defendant hit Roy Rauch on the back of the head and on the side of the head with the baseball bat. Defendant used a "baseball type swing." Defendant said Grigsby then kicked Roy Rauch. Defendant told Mineo he saw Roy Rauch on the ground "doing the fish dance" and shaking and coughing. Defendant said he hit Roy Rauch twice in the head and those were the only times he hit him. Defendant said he did not hit Roy Rauch while he was on the ground.

Defendant then walked back towards the house with Grigsby, Weldon, and Bradley, at which point defendant stated "I think I killed the Old Boy. I killed him." After Jay Weldon took the bat from him, defendant said he did not see it again. Mineo then read defendant's signed statement of the events to the jury. Mineo said he later recovered an aluminum baseball bat from a wooden planter box not far from the Weldon residence.

Roy Rauch died shortly after the fight, although the exact date is not clear. A medical examiner's statement presented pursuant to a stipulation concluded that Roy died as a result of "cranial cerebral

injuries due to blunt trauma to the head and those injuries were consistent with the type of injuries he would expect to find in a person who was struck in the head with a hard·object, such as an aluminum baseball bat."

Laura Semerau, Roy Rauch's girlfriend prior to his death, testified for the defense that on June 11, 1991, she and Roy got into an argument. Semerau pushed Roy and Roy pushed her back and then slapped her in the face with the back of his hand. She later signed a battery complaint against Roy Rauch.

The jury returned a verdict of guilty on the charge of second-degree murder. The trial court sentenced defendant to 13 years of imprisonment.

Defendant contends on appeal that it was reversible error for the judge to instruct the jury as to the additional limits on the use of force available to defendant given the absence of any evidence for the proposition that defendant was the initial aggressor in his confrontation with Roy Rauch. Since defendant's theory at trial was self-defense, the trial court instructed the jury on the concept of the justifiable use of force, based on Illinois Pattern Jury Instructions, Criminal, No. 24—25.06 (2d ed. 1981) (hereinafter IPI Criminal 2d No. 24—25.06), as follows:

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against the imminent use of unlawful force.

However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another."

The court also approved, over defense objection, an instruction on the limits of justifiable force by an initial aggressor, based on IPI Criminal 2d No. 24—25.09, as follows:

"A person who initially provokes the use of force against himself is justified in the use of force only if the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person."

Defense counsel objected to this instruction, stating that the initial provocation of the use of force was by Roy Rauch and his friends when they approached defendant's group at Jay Weldon's home. Defense counsel contended that defendant's actions at the Glen Theatre did not constitute initial aggression leading up to Roy

Rauch's death since defendant and his friends abandoned their attack at the theater and went home. The trial court concluded that conflicting evidence existed on the issue of self-defense; thus, the jury should be given both the self-defense and the initial aggressor instructions so that it might decide between the conflicting evidence.

The question of self-defense, particularly whether defendant was the initial aggressor, is a question of fact for the jury to resolve. (See *People v. Crue* (1977), 47 Ill. App. 3d 771, 773-74.) The State and the defendant are both entitled to have the jury instructed on their theories of the case, and an instruction is warranted if there is even slight evidence to support it. (*People v. Barnard* (1991), 208 Ill. App. 3d 342, 349-50.) It is error to submit to the jury an instruction when there is no evidence to support it. (*People v. Williams* (1988), 168 Ill. App. 3d 896, 902.) Instructions as to an aggressor's justifiable use of force may be given if the State presents evidence that the defendant was the aggressor or even if there is a question as to whether defendant was the initial aggressor. (*Barnard*, 208 Ill. App. 3d at 350.) Giving this instruction to the jury does not erroneously assume that the defendant was the initial aggressor. (*People v. Johnson* (1993), 247 Ill. App. 3d 578, 585.) Rather, tendering both instructions to the jury allows the jury to decide between the conflicting evidence and apply the correct law. *People v. Dunsworth* (1992), 233 Ill. App. 3d 258, 265.

Defendant maintains that the trial court erred in giving IPI Criminal 2d No. 24—25.09 because there is no evidence that defendant here was the initial aggressor. The initial aggressor instruction provides that a person may not provoke the use of force and then retaliate claiming self-defense. (*People v. Fleming* (1987), 155 Ill. App. 3d 29, 32.) It has been held that a nonaggressor has a duty not to become the aggressor. (*People v. De Oca* (1992), 238 Ill. App. 3d 362, 367.) Even the mere utterance of words is conduct which may qualify a defendant as the initial aggressor. (See *Barnard*, 208 Ill. App. 3d at 350; *De Oca*, 238 Ill. App. 3d at 367.) In *De Oca,* the victim and his cousin admittedly instigated the initial confrontation when they approached defendant and several others who were standing on a porch. After this initial fistfight had spilled over toward the street corner and then ended, the defendant displayed a loaded shotgun and shouted at the crowd which had gathered on the corner to "get away." (*De Oca*, 238 Ill. App. 3d at 365.) The victim reached for his waist and defendant shot him. The conflicting testimony from the witnesses indicated the victim may have been in possession of a gun. After a bench trial, the trial court found that defendant became the initial aggressor after the fistfight and that his bringing the gun to

the area accelerated the situation. The reviewing court affirmed and determined that "[a]lthough defendant did not provoke the fistfight, the right of self-defense does not justify killing the original aggressor after the aggressor abandons the quarrel or as an act of retaliation and revenge." *De Oca*, 238 Ill. App. 3d at 368.

We recognize that the facts in *De Oca* differ somewhat from the present case; however, we believe the basic reasoning is applicable to the case at hand. The initial confrontation between defendant and Jay Rauch ended when both defendant's group and Rauch's group left the Glen Theatre. The testimony here indicates that Rauch's group provoked a second confrontation when they approached Weldon's house while yelling threats and throwing bottles. Defendant then apparently grabbed a baseball bat and shouted "if you want some, come get some." The Rauch group began retreating back to their cars and Jay Weldon, Bill Bradley, and defendant pursued them. We believe that a jury question was presented at this point as to whether defendant became the aggressor in the situation since he could have chosen not to pursue Rauch's group as they retreated toward their cars. The evidence indicates that defendant smashed the windows in the Rauch group's car and then attacked Roy Rauch, who defendant believed was about to hit Grigsby with something. The evidence is clear that defendant hit Roy Rauch at least twice with a baseball bat. We believe the evidence presented at trial was sufficient to present a factual issue as to whether defendant was the initial aggressor in the fatal confrontation. Accordingly, we hold that the trial court committed no error in giving the instruction.

For the foregoing reasons, we affirm the decision of the circuit court of Du Page County.

Affirmed.

INGLIS, P.J., and QUETSCH, J., concur.